UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN R. MALONE, JR., AS TRUSTEE OF THE GORDON L. BEELER IRREVOCABLE TRUST DATED MAY 26, 1999, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | )         **3:05-CV-660 WCL** |
| | ) |
| RELIASTAR LIFE INSURANCE COMPANY and AXA EQUITABLE LIFE INSURANCE COMPANY, | ) ) ) |
| Defendants. | ) ) |

<u>MEMORANDUM OF OPINION AND ORDER</u>

This matter is before the court on Plaintiff John R. Malone, Jr., as Trustee of the Gordon L. Beeler Irrevocable Trust Dated May 26, 1999's (plaintiff or Beeler Trust) "Renewed Motion for Judgment as a Matter of Law, or in the Alternative, For New Trial" (Doc. No. 102).

### INTRODUCTION

The Beeler Trust is an irrevocable trust and the named beneficiary of three (3) insurance policies[1] issued by AXA Equitable Life Insurance Company (AXA) and Reliastar Life Insurance Company (Reliastar) on the life of Gordon Beeler (Mr. Beeler), with a face value totaling $2,600,000.00. Specifically, AXA issued Policy No. 41-233-834 payable for $500,000.00 upon the

---

[1] By application dated November 29, 1999, the owner and the beneficiary of the policies were changed from Gordon Beeler to the Beeler Trust, naming Mrs. Beeler's brother, John Malone, the Trustee of the Beeler Trust. The parties stipulated that the insurance polices were valid contracts and the proceeds remain unpaid.

death of Mr. Beeler[2], and Reliastar issued Policy Nos. 7011915 and 7014919 payable upon Mr.

Beeler's death[3] for $600,000.00 and $1,500,000.00, respectively.

When Mr. Beeler disappeared on January 31, 1998, he was fifty-one years old, leaving behind

his wife of twenty-seven years, Kathleen Malone Beeler (Mrs. Beeler), and four children, Margaret

(Meghan)[4], John (22), Molly (19), Kathleen (Katie) (17), and Colleen (12).  On August 11, 2003, the

St. Joseph County Probate Court declared Mr. Beeler deceased, pursuant to probate's five-year

presumption of death.  *See* Ind. Code 29-2-5-1.  Therefore, the Indiana State Department of Health

issued a death certificate for Mr. Beeler on September 9, 2003.  The Beeler Trust submitted death

claims to AXA and Reliastar, but their claims were denied based on Indiana's common law seven-

year presumption of death.  *See infra*.  The claims procedure was reinstated in February of 2005, yet

AXA and Reliastar again refused to pay the death benefits, although other insurance companies paid

their proceeds to the tune of $640,000.00.

On June 19, 2006, the Beeler Trust filed its Amended Complaint in this court based on

diversity jurisdiction, alleging breach of contract and bad faith against AXA and Reliastar

(defendants).  On March 21, 2007, the court granted summary judgment in favor of the defendants

---

[2]The AXA '834 policy indicates that the policy would be paid after receiving "(1) proof satisfactory to us that the insured person died before the Final Policy Date; and (2) all other requirements we deem necessary before such payment may be made."

[3]The Reliastar '915 and '919 policies both state: "we will pay the proceeds according to the Death Benefits portion of the Summary of Benefits on page 3, if we receive written proof that the insured died while this policy was in force."

[4]Meghan Beeler was tragically killed on January 24, 1992, when the bus she was on, along with the University of Notre Dame swim team, overturned during a snowstorm upon its return trip from a meet at Northwestern University.

on the issues of punitive damages and bad faith.[5]  In denying summary judgment as to whether the Beeler Trust could invoke the rebuttable presumption of death, the court explicitly stated: "The issue as to the applicability of the so-called rebuttable presumption is and will be the centerpiece of any trial by jury that will be had in this case . . .What will go before this jury for decision and determination is whether by a preponderance of the evidence these plaintiffs can invoke the rebuttable presumption of seven years as outlined in *Equitable Life Assur. Soc. v. James*, 127 N.E.11 (Ind.Ct.App. 1920).  Such is a jury question and that is the only jury question that will be presented." (Doc. No. 46 at p. 4-5).

A jury trial was held from May 21, 2007 through May 29, 2007, and the jury returned a verdict in favor of the defendants.  The extensive facts proved at trial can be summarized as follows:

## THE TRIAL

Prior to 1992, the Beeler family had an ideal life – family vacations, traditions, and trips to their condominium in Marco Island, Florida.  Mr. Beeler, a savvy businessman, paid close attention to the families' investments, was worth several million dollars, and had college funds created for each of the children.  Mr. Beeler was such a planner, that he took out six (6) life insurance policies on himself.[6]  After Meghan's death, the family had a hard time adjusting, and Mr. Beeler decided to move the family down to Jacksonville, Florida in August 1992.  The family permanently moved back to Granger, Indiana in June 1996, and family life for the Beeler's was good.[7]

---

[5]On May 24, 2007, the Beeler Trust submitted an offer of proof on the issue of bad faith/punitive damages in order to preserve the issue for appeal (Doc. No. 96).

[6]Physically, Mr. Beeler was a big man, approximately 6'1" and 260 lbs, with large glasses.

[7]However, at the time Mr. Beeler was battling a number of health problems, including phlebitis, gout, high blood pressure, and blood clots in his legs which required prescription Jobst support hose.

In June 1997, Mrs. Beeler was working as a school teacher at Corpus Christi, where she met Mary Sharpe, a married 36-year-old who was the cheerleading and softball coach at the same Catholic school.  It was during this time and into the Spring, that Mr. Beeler's behavior changed dramatically.  Mr. Beeler would come home, change quickly, and go out to Colleen's softball practices coached by Mrs. Sharpe.  He began losing weight by exercising obsessively at home in the dark with music blasting.  He drank heavily, dressed differently, styled his hair differently, and stopped wearing his glasses.  He became disengaged from the family– stopped grilling out and stopped attending the kids' sporting events, but spent more time with Colleen who was being coached by Mrs. Sharpe.  During the summer, Molly wrote a letter pleading for her dad to spend more time at home; but Mr. Beeler just crumpled the letter up and threw it on the floor.

By August, Mr. Beeler's physical and emotional health became more alarming.  He began taking five to six sleeping pills at night.  Mrs. Beeler voiced her concern, suspecting that her husband was having an affair with Mrs. Sharpe, but Mr. Beeler denied it.  Eventually, Mr. and Mrs. Beeler started marriage counseling, and based on the counselor's advice, Mr. Beeler began staying at the Signature Inn for several days in order to be apart.  Mrs. Beeler and the three girls even went on vacation to Los Angeles without Mr. Beeler on August 13.  While apart, Mr. Beeler called California several times a day telling Mrs. Beeler how much he missed and loved her and the kids.

But, when the Beeler's returned from Los Angeles on August 18, Mr. Beeler's car was in the garage and he was nowhere to be found.  In Mr. Beeler's home office, Mrs. Beeler found a stack of papers bound by a rubber band, and a letter from Mr. Beeler dated August 12 with the name "Kathy" written on it.  Although Mrs. Beeler testified that she was very worried about Mr. Beeler's whereabouts, she testified that she never bothered to read the contents of the letter until some time

4

later.[8]  She would then discover that the stack of papers consisted of information concerning the Beeler's important business affairs, a balance and net worth sheet of assets totaling over 8 million dollars, insurance policies, contact information, and unusually explicit directions for how Mrs. Beeler should handle the Beeler's  financial and business affairs– normally handled by Mr. Beeler. Mrs. Beeler contacted Sheriff Joseph Speybroeck the next morning, hoping to find her missing husband.

After the police were alerted, Mr. Beeler finally called Mrs. Beeler a couple of days later from New Orleans.  Mr. Beeler told her that he took a train to New Orleans for "business" and would be home in a few days.[9]  Part of Mr. Beeler's undisclosed "business" included trading Micron Tech stock and selling other stocks amounting to $124,000.00.  When Mr. Beeler returned from New Orleans, Mrs. Beeler picked him up from the airport and brought him home.  Despite Mrs. Beeler's repeated attempts to find out what he was doing in New Orleans, Mr. Beeler only told her not to worry about it– that it was just business.  At trial, Mrs. Beeler did not remember asking Mr. Beeler about the stack of financial and business information left in his office, but she did recall asking Mr. Beeler to get evaluated at a mental health care facility.  He, of course, refused because he was too concerned about his public appearance and he didn't want to be embarrassed.

Mr. and Mrs. Beeler continued marriage counseling.  But by the end of August, Mr. Beeler was back to participating in Colleen's sports, where Mary Sharpe was present.  He again moved out of the home, and Mrs. Beeler described their relationship as "very tense."[10]

---

[8]Trans. at Vol. I, 112.

[9]Trans. at Vol. II, 111.

[10]Trans. at Vol. I, 92.

During September and October, Mr. Beeler was drinking even more, to the point where he was caught by Mrs. Beeler driving Colleen home drunk one night.  Mrs. Beeler oftentimes asked her husband about his whereabouts, but he would just respond by telling her to leave him alone, she was too distrustful and needed to stop being his policeman.[11]  Mrs. Beeler's suspicions continued, as Colleen told her mom that one of her schoolmates asked 'whether daddy and Mrs. Sharpe were dating.'  Also around this time, Mr. Beeler wrote Mrs. Beeler a letter stating that he didn't know where to stay the night or the following night, but from Friday, September 26 through December 19, he would stay at Studio A on Main Street.[12]  The letter also discussed the terms of their "trial" separation.  Mr. Beeler asked if he could stay at their home while the family went to Marco Island for two weeks during Christmas break.  He also asked his wife whether she would consider letting him go to Colleen's volleyball games, whether she agreed about several investment projects, and whether she would consider not changing the locks to the house so that he could use his office during the Fall.  In addition, he requested that she not involve lawyers, told her that she could have whatever she wanted, and promised never to call anymore.

Several months later, the Beeler's attempted to get back together, so once again, Mr. Beeler moved back into the home.  Mr. Beeler continued to act strangely, and the family's  Thanksgiving was very tense.  Molly testified that "[they] were all concerned about [their] dad.  His appearance was continuing to change, and he was just different.  He wasn't his normal self to be around, fun-

---

[11]Trans. at Vol. I, 101.

[12]Although Mrs. Beeler testified that she did not kick Mr. Beeler out of the house, she was unable to recall why Mr. Beeler did not know where he was going to stay.  Trans. at Vol. II, 126-27.

loving person."[13]

The Beeler's attempted separation again in December 1997.  Mrs. Beeler could remember little of the details surrounding the successive separation.  It didn't work because on December 10 Mr. Beeler left his wife another note– this time indicating that he was at the Residence Inn,[14] reminding her that he would return to the house from 12/19 to 1/4, and "then [he would] be out."[15]

For Christmas, Mrs. Beeler and the Beeler children "agreed" to spend Christmas at the family's condominium in Florida, apart from Mr. Beeler for the first time over the holidays.[16]  Mr. Beeler called the family in Florida every day, pleading with Mrs. Beeler that they should be together.  Aside from what Mr. Beeler was telling his family, he stayed busy in their absence, renting a home at 1015 Hudson Street on Christmas Eve, and throwing a party at the Beeler's home in Granger on December 27 (Meghan Beeler's birthday anniversary).  Also during this time, he drafted an updated version of his resume, dated December 28– what plaintiff called an obituary.

Mrs. Beeler, Katie, and Colleen returned from Florida on January 4, 1998, while John and Molly stayed behind due to their extended college breaks.  Upon Mrs. Beeler's return, Mr. Beeler was gone as promised, and she found a note from her husband on their bed.  The note advised her that he was at the house he just rented on Hudson Street, and requested that she give him a call.

On January 7, Mrs. Beeler decided she wanted to reconcile, and went to see her husband at

---

[13]Trans. at Vol. III, 102.

[14]A receipt produced at trial indicated that Mr. Beeler checked into the Residence Inn on December 6 and checked out on December 21.  Trans. at Vol. II, 137.  The receipt also revealed that only one call was made by Mr. Beeler from the hotel to the Beeler home.  Trans. at Vol. II, 137-38.

[15]Trans. at Vol. I, 111.

[16]Trans. at Vol. III, 137.

the Hudson Street house.  When Mrs. Beeler arrived early in the evening, Mary Sharpe's car was in the driveway.  Mrs. Beeler knocked on the door and window, but no one answered.  She pushed open the door only to find her husband with Mary Sharpe in the bedroom.[17]  Mr. Beeler unsympathetically told his wife that she "shouldn't have come. . . this is [his] place now, and [she] shouldn't have come."[18]  Mrs. Beeler left distraught and picked up Colleen at Corpus Christi.  While there, she found Mary Sharpe's husband practicing with the basketball team, and told him about the affair.  Then, Mrs. Beeler went to her parents' home with Colleen, and phoned the Beeler children to tell them about the affair.  John and Molly returned from Florida on January 8, only after John closed the Beeler's Florida bank account, taking all the money, and after Molly, although she testified that she wasn't angry,[19] cut her dad's shirts and tennis racket strings to shreds and removed his chair from the dining room table.  The following day, Mrs. Beeler, with the help of her attorney, filed for a "formal separation" and temporary restraining order, and the case was set for hearing on January 28, 1998. After the bombshell incident, the children would not speak with their dad when he stopped in at home, and Katie told her father to go to hell.  On one occasion, Mrs. Beeler recalled Mr. Beeler stopping in at home to get some papers and pushing her out of his way against the refrigerator before he left.[20]  Mrs. Beeler was forced to admit that after the bombshell incident, her husband suggested on more than one occasion that they get a divorce – but she refused to do so, even though this was

---

[17]The incident at Hudson Street was coined during trial as the "bombshell" that hit.  Trans. at Vol. VI, 93.

[18]Trans. at Vol. III, 10-11.

[19]Trans. at Vol. III, 119.

[20]This was not the first time Mr. Beeler had physically abused Mrs. Beeler. Trans. at Vol. III, 27-28.

not Mr. Beeler's first affair.[21]

Realizing his mistake, on January 16, Mr. Beeler sent his wife a fax before he left for Marco Island.  Mr. Beeler declared his love for her and wanted to declare a truce and live life together again.[22] He asked Mrs. Beeler for constructive dialogue.  Mrs. Beeler did not respond to the letter.

Rejected, Mr. Beeler returned to Marco Island to find his belongings destroyed.  On January 24, Mr. Beeler faxed a letter to his wife:

> It is not fair for us not to be together 1/24 [the anniversary of Meghan's death], 12/27 [Meghan's birthday], 12/25 [Christmas] – it's wrong.  I tell you 2 nites ago that let's talk and we promise not to hang up [but] you hang up 3 of 4 times.  You tell me that John's teeth are a problem, Katie has/might have cancer, tell me nothing about CG basketball, school, etc. tell me only that Molly is staying at home.  I'm their father and a human being.  I've made a mistake and said I'm sorry.  Everyone twists the story around.  The lawyers are playing us, you tell me exaggerated stories, I'm sure [the] Sharpe's are pushed to a corner and are "reaching for the facts."
> I say to you on 1/22, "Is this how you want it to end?"  You say "I could care less if I ever see you again."  THAT SOUNDS FINAL.
> I had never talked to Mary [Sharpe] since that Wednesday but I call her to see what the hell is going on because everybody knows in S.B./Granger except me.  She takes my call and tells me about the havoc that exists.  She and I will not talk again, but at least I know some things now.  10 times you told me to leave this Fall.  6 or 7 [times] I did.  Since that first meeting with Dr. Peterson [the marriage counselor], it has been hell.  Every day you'd say where were you, what did you do, who . . ., when. . . .  I continually said step above this, STOP THE PARANOIA.
>
> Now I'm saying you are smart, be a big girl, smart girl.  Think about what you know we can do for each other.

---

[21]Mrs. Beeler suspected that her husband had an affair shortly after their marriage in 1973 or 1974 with an old classmate, and in 1984 and 1985 she and the children knew he had an affair while they lived in New Jersey.  Trans. at Vol. II, 61-66.

[22]Trans. at Vol. II, 148-49.

9

> We're 50 and we have a beautiful family – it's been <u>hurt</u>, but you and I together over time can make it healthy
>
> My parents are at <u>our</u> home and you claw/scratch me and have me go to [a] hotel.  <u>Next</u> morning we make up and you said you'd do something you never did . . .
>
> I'm sorry for what I did (and it will never happen) and if you could only say "I hurt you and might have been responsible <u>a little</u>" then you could eliminate this hatred/paranoia.
>
> Let us be best friends.  Let me support the family, pay the bills, go to Wee Shape in the morning, do car pools with you and for you when you need it, talk about our days, be with <u>our</u> friends, RELAX!!
>
> Kathy, Listen to your heart.  You know where I'm coming from. You'll be happy and we will be best friends.  Now's the time. . .

Trans. at Vol. I, 131 - 135, Exb. 4.

Again refusing to reconcile, Mrs. Beeler would not call off her lawyer, and so she and Mr. Beeler attended their separation hearing on January 28.  The temporary restraining order and formal separation order were entered.  This would be the last time Mrs. Beeler would see her husband.[23]

On Friday, January 30, Katie wished her father a happy birthday when he called home. Later he called again and talked to Mrs. Beeler who warmly wished him a happy birthday. As they chatted, Mr. Beeler mentioned that he was getting together with their friends in Marco Island later that day.

On Saturday morning Mr. Beeler called the house again and discussed the great weather in Marco with his wife, and wished that she were with him.  Mrs. Beeler commented that it wouldn't be long before the kids were grown and they could spend more time in Marco.  Unexpectedly, John

---

[23]Mr. Beeler had also managed to call Mary Sharpe from an airport sometime in mid to late January. Mr. Beeler told Mrs. Sharpe, "I'm leaving."  Trans. at Vol. IV, 58. Mrs. Sharpe told Mr. Beeler not to call again, and hung up the phone.  This was the last time Mrs. Sharpe would speak with Mr. Beeler.

came downstairs and asked his mother who was on the phone.  She replied that it was dad.
Overhearing John's interruption, Mr. Beeler stated to his wife, "Well, you don't have to worry about
it anymore, because I'll never wake up any of those kids again" and he hung up the phone.

That was the last conversation Mrs. Beeler had with Mr. Beeler, as he never called back and
would not answer when she called.  That same day, Mrs. Beeler asked the condominium managers,
Dee and Jerry Bare, to look in on Mr. Beeler.  After doing so, Mrs. Bare called back and informed
Mrs. Beeler that Mr. Beeler had "winterized" the condominium– meaning the place was closed up,
the curtains drawn, and the car placed in the carport.

The following day, Mrs. Beeler continued to call her husband and checked in at the tennis
hut, to no avail.  She also called Sheriff Joseph Speybroeck and  Lieutenant Governor Joe Kernan
to ask for their assistance.  On February 3, Mrs. Beeler received Mr. Beeler's "farewell" package
postmarked from Key West, Florida.[24]  The package contained credit cards, $15,000 "extra" cash and
travelers checks, Mr. Beeler's Indiana and Florida driver's licenses, his passport[25], notes, and a
combination to the locker he rented on January 28 in South Bend under an assumed name.[26]  The
package also contained a farewell letter dated January 31, 1998, which read:

---

[24]In January, just prior to Mr. Beeler's disappearance, Bruce McCort reported seeing Mr. Beeler
in Key West.  Trans. at Vol. III, 36-37.  John Beeler went down to search for his dad in Key West during
his spring break in 1998.  Trans. at Vol. III, 38.

[25]The passport expired August 5, 1987.  Mr. Beeler traveled to Bermuda in 1991 where he
opened a bank account, and to the Bahamas in 1990 or 1991, without a passport.  Trans. at Vol. III, 64-
66.  The passbook from the Bank of Bermuda, which was required to make deposits or withdrawals, was
presented at trial and showed only the initial deposit.  Trans. at Vol. III, 66-67.  To Mrs. Beeler's
knowledge, no one went to Bermuda as part of the investigation into Mr. Beeler's disappearance.  Trans.
at Vol. II, 67 - 68.

[26]Mrs. Beeler and Sheriff Speybroeck went to the storage locker in mid-February and found
several miscellaneous items belonging to Mr. Beeler, including clothes and several pairs of his
prescription Jobst support hose.

Kathleen, Marco condo is immaculate. I had it cleaned again so there is no trace of me. I put my clothes in a tub in the carport, so obviously you can throw it away or – I've had a little extra cash, so I have not spent any of our money for three weeks, thus all checking accounts (NBD and Key) are intact. The money I'm sending is extra and put it in the Valley account so it's in your name. This past week I sold 1000 shares of John's Mueller [stock]. After taxes we received $42,000. I put this in our account and bought $28,000 of stock for CG's [Colleen Grace] account (Wabash National). Also I had KEB [Katie] give (gift) CG $10K and I bought McDonald's for CG – good long term investment (4-7 years) for her college. The other money from JLB [John] I left in our Key account as he borrowed $21,000 last year (It's on my desk left hand side). I also took $45,985 out of our McDonald Security Account and put in Key account checking. I left all of my check books (yours – now) in briefcase in golf cart in garage. If you haven't forced it open or seen it open yet, the combination is 1-30.

As John and Molly both said, "I hope you give us our money" – Now you have it.

If I were you (I'm sure I'm wasting my time) I'd have a lawyer (Jim Brotherson, he liked you . . .) help you with John Martin buying out Wee Shape. Keep the Real Estate in 58211 C.R. 105 S Corp. It has a rent of $13,000 per month. Also, always keep at least one percent of Wee Shape/B&H/Ligonier as that will keep you, et. al., with medical insurance. Also, have John Martin give you my salary, ($95,000 per) until he gets you bought out." John Martin will help you with anything including 1997 taxes.

Trans. at Vol. I, 141 - 144, Exb. 8. This was the first time Mr. Beeler gave Mrs. Beeler explicit

directions on how to handle the family's financial affairs in the future, and treated Mrs. Beeler as the

owner of certain assets. In fact, Mrs. Beeler received brokerage and financial statements at her

home, as opposed to Mr. Beeler's office, even though neither she nor John Martin[27] directed the

---

[27]John Martin prepared the Beeler's taxes from 1993 through 2004, and was a business partner of Mr. Beeler's. As a result of Mr. Martin's personal and business relationship with the Beeler's, after Mr. Beeler disappeared, Mr. Martin conducted the financial investigation to determine whether Mr. Beeler was squirreling away money. Mr. Martin ran credit checks, tracked all of the Beeler's financial affairs, and investigated the finances of Mr. Beeler's businesses– including those in which Mr. Martin had a personal interest. Mr. Martin too, had a life insurance policy on Mr. Beeler, for $300,000– which is not the subject of this case. Trans. at Vol. IV, p. 90-94. At the time Mr. Beeler disappeared, Mr. Martin

institutions to change the mailing address.

After requesting the Bare's to send everything left behind in the condominium, Mrs. Beeler received a second package.  The package from the Bare's included a copy of the deposit Mr. Beeler made into her bank account, other credit cards, Mr. Beeler's calendar, address book, wallet, family pictures, travel club cards, travelers checks that went unused after January 31, and a note written by Mr. Beeler stating "All my clothes are in storage.  If you want them, the combination is 12-30.  If they're not picked up by 7/1/98 they take them and sell or – . . ."[28]  Also enclosed was the receipt for payment of the storage locker in South Bend and a note written by Mr. Beeler which read, "Parent Alienation Syndrome."[29]

Mrs. Beeler and John Martin hired Clarence M. Kelley and Associates (Kelley firm) to investigate Mr. Beeler's disappearance.  Investigators Tom Krupp and James Hummell were assigned to the case.  Mrs. Beeler provided the Kelley firm with a list of all of the Beeler's credit card numbers, the numbers on the travelers checks that remained uncashed, checking account numbers, pictures, and information concerning Mary Sharpe, the Beeler's condominium in Marco, Mr. Beeler's friends, barber, doctors, past hobbies, and business interests.

Despite the need to conduct a diligent investigation, Mr. Krupp and Mr. Wood[30] were not

---

thought that Mr. Beeler was wrapping up his business affairs; yet, as Mr. Martin cleaned-up the unfinished business, and likely because it hurt Mr. Martin's interest in his case, he felt that Mr. Beeler had left a lot undone.  Trans. at Vol. IV, p. 112-114.

[28]Trans. at Vol. II, 18.

[29]Trans. at Vol. III, 39.

[30]Mr. Wood contacted the Beeler's in 2005 during his investigation into Mr. Beeler's disappearance on behalf of the insurance companies.

provided financial documents.[31]  Mr. Martin testified that he conducted the financial investigation, because he was better equipped to handle it and he did not want to spend the money on duplicating efforts[32]– so he kept the investigators and the state police involved in "their work."[33]  Mr. Martin admitted to destroying corporate records from businesses in which he and Mr. Beeler were involved, and to never drafting a written report of his findings.[34]  Mrs. Beeler believed John Martin, who determined that no assets turned up missing after Mr. Beeler's disappearance.

In hopes of finding her husband, Mrs. Beeler also contacted Chuck Hurley, the Director of Security at the University of Notre Dame, and hung photos of Mr. Beeler around campus.  She called their marriage counselor and Mr. Beeler's friends and business relations to ask about his whereabouts, and filed a missing person's report in Collier County, Florida.  Mrs. Beeler found out who attended Mr. Beeler's party on December 27, and called them in an attempt to find Mr. Beeler.  Mrs. Beeler chose not to run a local ad publicizing Mr. Beeler's disappearance in 1998 because she wanted to protect the family.

In March 1999, Indiana State Police officers continued their investigation and found two letters in Mr. Beeler's home office, one written by Molly in 1998 displaying her disgust and hurt over Mr. Beeler's affair, and another, written by John, which very harshly addressed Mr. Beeler's infidelity.[35]  Mrs. Beeler refused to provide copies of the letters to the police, because she didn't want

---

[31]Trans. at Vol. IV, 116-117.

[32]The police had investigators specialized in the area of conducting financial investigations which would have been conducted free of charge.

[33]Trans. at Vol. IV, 116-123.

[34]Trans. at Vol. IV, 131-32; Trans. at Vol. VI, 125-26.

[35]Mrs. Beeler did not recall John's letter. Trans. at Vol. III, 16-20.

the kids to think they had caused their dad to leave.[36]  The officers were further limited in their

investigation, because the family would not allow the media to be contacted and because Mr. Martin

never provided the financial records– even though a close friend of Mr. Beeler's, Jim O'Donnell,

inferred that Mr. Beeler may have hid money in the Cayman Islands or Bermuda.  With nothing else

to do, the state police concluded their investigation.

Shortly after Mr. Beeler's disappearance, several possible sightings of Mr. Beeler were

reported: (1) Dean Maxwell, who regularly landscaped the Beeler's house starting in 1988, reported

seeing Mr. Beeler around June 1998 in South Bend in his blue Cadillac;[37] (2) Dianne Aitken, a friend

of Mrs. Beeler's (who likely met Mr. Beeler in 1990 at a reunion) reported in the summer of 2000

seeing a man that looked like Mr. Beeler at Sloppy Joe's, a bar in Key West– but he disappeared

after Mr. Beeler's name was mentioned; (3) Dar Wiekamp, a friend of Mr. Beeler's who owned

Valley American Bank, reported seeing Mr. Beeler; (4) Mary Hunt, the Beeler's neighbor, reported

seeing Mr. Beeler at the Jacksonville airport in 1998; (5) Gretchen Stamp who knew the Beeler's

from various associations, reported seeing Mr. Beeler at the Basilica at Notre Dame in the summer

of 1998; and, (6) Jeff Catanzarite, a friend of the Beeler family, saw a man riding a scooter in Key

West near Sloppy Joe's who looked like Mr. Beeler.[38]  Diane Aitken, Mary Hunt, and Jeff

Catanzarite's sightings were just a few months after his disappearance.  The leads were eventually

followed to no avail.  The Kelley firm suspected as of July 1998 that Mr. Beeler was being fed

information from someone in the northern Indiana area, but Mrs. Beeler stopped using the Kelley

---

[36]Trans. at Vol. III, 24.

[37]In 1995, Mr. Beeler traded in his blue Cadillac, and Mrs. Beeler never saw it again.

[38]Trans. at Vol. II, 41 - 45; Trans. at Vol. III, 50-54.

15

firm about a year after Mr. Beeler's disappearance.[39]

In 2004, Lisa Liegl, an educated young lady who felt terrible for the family and had no interest in testifying, stated that she was "100 percent" sure that she saw Mr. Beeler in the Indianapolis Airport at McDonald's on May 22, 2004.[40]  When Lisa saw Mr. Beeler, she knew that he had been reported missing, but didn't speak to him because she feared for her and her family's safety.  Lisa, having clearly viewed Mr. Beeler as he walked towards her, and having watched him for several minutes while he sat to her right at the restaurant, was able to describe Mr. Beeler's appearance– she knew it was him.  As she watched him, Lisa noticed he held an airline ticket with the name "Charles Gordon" on it.[41]  Although the state police had concluded their investigation of Mr. Beeler, they followed up on Ms. Liegl's information, without any success.

In 2005, Mrs. Beeler was contacted by the insurance companies' investigator, Cliff Wood.  Mrs. Beeler signed a sworn statement for the investigation, reflecting that Mr. Beeler did not drink excessively, nor used sleeping pills on a frequent basis.  Mrs. Beeler also signed an affidavit for purposes of the 2003 probate proceeding wherein Mr. Beeler's death certificate issued.  The affidavit failed to mention any of the sightings known to Mrs. Beeler, and said nothing about marital problems, affairs, or about Mr. Beeler's moving out of the house on several occasions.  Insurance representatives indicated that with the information received from Mrs. Beeler and despite their

---

[39]Trans. at Vol. II, 60 - 61.

[40]Lisa Liegl was familiar with Mr. Beeler because in 1989, Mr. Beeler helped Lisa's father build a fence around their Elkhart home, she saw the Beeler family at swim events, and she had once or twice been in the Beeler home when Mr. Beeler was present.  Mr. and Mrs. Beeler attended a couple of social events with Lisa's parents, and sent Christmas cards, two of which contained a picture of the Beeler family.  Prior to the 2004 sighting, Ms. Liegl had last seen Mr. Beeler when she was 8 or 9 years old in 1991, but she had glanced at the Beeler's family picture every year since 1991.  Trans. at Vol. IV, 12-25.

[41]Trans. at Vol. IV, 41, 46.

diligent search, Mr. Beeler could not be found.

After the close of evidence, on May 25, 2007, the Beeler Trust moved for judgment as a matter of law, based on two propositions.[42]  First, the Beeler Trust argued that it had "proven the three factual predicates necessary to invoke the presumption that Gordon L. Beeler is dead" and thus the presumption of death applied as a matter of law.  The Beeler Trust also argued that the insurance companies failed to come forward with "credible evidence as a matter of law that is inconsistent with the presumed fact that Gordon Beeler is dead."  Second, the Beeler Trust argued that even without the presumption, the facts show that Mr. Beeler is dead.[43]

The court denied the motion because it could not be said that the facts were not disputed or that the only inferences favored the plaintiff.  This court reasoned that many questions existed regarding the weight to be given to certain testimony and the credibility of the witnesses, and that, many factual findings required the jury's determination.[44]

Before submitting the case to the jury, the jury instruction settlement conference was conducted.  Of significance, the Beeler Trust agreed that the presumption instruction coincided with the jury verdict form, and only objected to the final version of instruction number 22 because it included a definition for the phrase "inexplicably absent".  The Beeler Trust argued then, as it does

---

[42]Trans. at Vol. V, 37-39.

[43]Prior to trial, the Beeler Trust never objected to this court's March 21, 2007 ruling that the <u>only</u> question to be presented to the jury, was whether or not the Beeler Trust could invoke the presumption of death, and whether that presumption could be rebutted.  In fact, the Beeler Trust only outlined its ability to win this case based on the presumption of death.  *See*, Plaintiff's Trial Brief dated May 7, 2007 (Doc. No. 56), Plaintiff's Proposed Jury Instructions dated May, 16, 2007, p. 5, 6 (Doc. No. 72), Parties' Agreed Proposed Jury Instructions dated May 16, 2007, p. 2 (Doc. No. 76); and Plaintiff's Proposed Special Verdict Form dated May 20, 2007 (Doc. No. 87).

[44]Trans. at Vol. V, 41-42.

now, that defining the term "inexplicably absent" placed a heavier burden on the Beeler Trust to prove that "the only explanation is death."[45]  Further, although previously conceding that it was "content with the verdict form,"[46] the Beeler Trust later objected to the verdict form– arguing that even if the Beeler Trust failed to prove that the presumption of death arose (question 1 of the verdict form), then the jury should be given the opportunity to answer whether the Beeler Trust was able to prove the ultimate fact of Mr. Beeler's death (question 3 of the verdict form).[47]  Convinced that there was no flaw, the court overruled any objection to the verdict form.[48]

---

[45]Trans. at Vol. V, 65-68.

[46]*See* Trans. at Vol. V, 78.

[47]*See* Trans. at Vol. VI, 3-6.

[48]The special verdict form tendered to the jury on May 29, 2007 (Doc. No. 98-2) read as follows:

The jury should consider the following questions and must be unanimous in the answers to each relevant question.
**(1) Presumption of Death issue:**
        Do you find that plaintiff has proven by a preponderance of the evidence that Gordon L. Beeler has been inexplicably absent from home for a continuous period of seven (7) years, has failed to communicate with those persons who would be most likely to hear from him, and cannot be found despite diligent inquiry and search?
        ___ Yes                                    ___ No
**If you have answered "No" to Question No. 1, then please <u>do not</u> answer any other questions.  By answering "No" you have found for the Defendants, stop here and sign the form below.  If you answered "Yes," please <u>proceed</u> to Question No. 2.**

**(2) Rebutting the presumption of death issue:**
        Do you find that Defendants have introduced evidence sufficient to rebut the presumption of his death?
        ___ Yes                                    ___ No
**If you have answered "No" to Question No. 2, then please <u>do not</u> answer any other questions.  By answering "No" you have found for the Plaintiff, stop here and sign the form below.  If you answered "Yes," please <u>proceed</u> to Question No. 3**

**(3) Ultimate fact of death issue:**
        Do you find that the plaintiff has proven by a preponderance of the evidence the ultimate fact of Gordon Beeler's death by direct and/or circumstantial evidence and the reasonable inferences to be drawn from them?

After the six-day jury trial, concluding on May 29, 2007, the jury found that the Beeler Trust failed to prove by a preponderance of the evidence that the presumption of death arose as to Mr. Beeler.[49]  Thus, the jury never had to consider whether the defendants had produced evidence sufficient to rebut the presumption of death, and found in favor of the defendants.  After the verdict, the Beeler Trust renewed its motion for judgment as a matter of law or new trial.

## DISCUSSION

When a person is inexplicably absent from home for a continuous period of seven years, fails to communicate with those persons who would be most likely to hear from him, and cannot be found despite diligent inquiry and search, that person is presumed to be dead.  *Roberts v. Wabash Life Ins. Co.,* 410 N.E.2d 1377, 1382 (Ind.Ct.App. 1980) (citing *Equitable Life Assur. Soc. v. James*, 127 N.E. 11 (Ind.Ct.App. 1920); *Metropolitan Life Ins. Co. v. Lyons,* 98 N.E. 824 (Ind.Ct.App. 1912)).  This is not a conclusive presumption, but may be rebutted by proof of facts and circumstances inconsistent with, and sufficient to overcome, such presumption. *Roberts*, 410 N.E.2d at 1382 (citing *Equitable Life*, 127 N.E. at 12).  Once evidence is introduced of the basic facts which gave rise to the presumption of death, the insurance companies have the burden of going forward with evidence rebutting the presumption of death.  *Roberts*, 410 N.E.2d at 1383. It is for the jury to say whether such evidence is sufficient to rebut the presumption.  *Roberts*, 410 N.E.2d at 1382 (citing *Equitable Life*, 127 N.E. at 12).  If the insurance companies do not rebut the presumption, then the plaintiff

---

_____ Yes                              _____ No
**If you have answered "No" to Question No. 3, then you have found for the Defendants, please stop here and sign the form below.  If you answered "Yes,"then you have found for the Plaintiff, please stop here and sign the form below.**

[49]The jury answered "NO" to the first question on the verdict form.

prevails. *Roberts*, 410 N.E.2d at 1383.  If the insurance companies do introduce competent evidence to rebut the presumption of death, the plaintiff is then obligated to prove, by direct and circumstantial evidence and the reasonable inferences to be drawn therefrom, the ultimate fact of death.  *Roberts*, 410 N.E.2d at 1383-84.   The party relying on the presumption has the burden of proof throughout the trial.  *Roberts*, 410 N.E.2d at 1383.

The Beeler Trust argues that it is entitled to judgment as a matter of law or a new trial because: (1) the presumption of Mr. Beeler's death arose as a matter of law, thus it should not have been a jury question; (2) the jury instructions erroneously raised the standard for invoking the presumption of death by requiring Mr. Beeler to be 'inexplicably absent,' or that his absence be "unexplained by circumstances other than those suggesting death"[50]; (3) the presumption not only arose, but defendants failed to rebut the presumption of death as a matter of law; and (4) the verdict form did not let the jury properly consider whether the Beeler Trust could prove, independent of the presumption, that Mr. Beeler is deceased.  The court considers the Beeler Trust's contentions in turn.

## A.  Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  In deciding whether to grant a motion for judgment as a matter of law, the court "must view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed."  *Deimer v. Cincinnati Sub-Zero Products, Inc.,* 58 F.3d 341, 343-44 (7th Cir. 1995). "A mere scintilla is not

---

[50]*See infra*, Court's Final Jury Instruction Number 22 (Doc. No. 98).

20

enough . . .Once the [defendants] prevail before the jury, [their] method of proof at trial is irrelevant; [the court] simply ask[s] whether the jury's verdict [for defendants] could be sustained on the whole record." *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 545 (7th Cir. 1997).  In sum, this court's job is "'limited to assessing whether no rational jury could have found for the [defendants]'" and "[i]n doing so, 'this court may not step in and substitute its view of the contested evidence for the jury's.'" *Mathur v. Board of Trustees of Southern Illinois University,* 207 F.3d 938, 941 (7th Cir. 2000) (citations omitted); *see also, Collings v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998).

(1)   The Presumption of Death Arising as a Matter of Law

The Beeler Trust argues that the applicable case law, including *Roberts* and *Equitable Life,* dictate that the presumption of Mr. Beeler's death arose as a matter of law,[51] and the court should have instructed the jury to only consider whether defendants rebutted the presumption.  The plaintiff's reliance on *Roberts* and *Equitable Life* is misplaced.  Neither case held that the presumption of death arose as a matter of law.  Instead, in *Roberts* the trial court concluded that the disappearance of the insured was "explainable by a reasonable hypothesis other than his death"[52] and

---

[51]The Beeler Trust has directed this court's attention to the May 18, 2007 and January 24, 2008 rulings issued by Judge Stephen R. Bowers of the Elkhart Superior Court in the state case *Valley Forge v. John Martin*, Cause No. 20D02-0508-PL532, in which John Martin sought to recover the proceeds of the life insurance policy on Gordon Beeler.  In relevant part, Judge Bowers concluded that Mr. Martin was entitled to the presumption of death, that the defendant failed to overcome the presumption by credible evidence, and that even if the presumption of death were deemed rebutted, then Mr. Martin proved by a preponderance of the evidence that Mr. Beeler is dead.  However, Judge Bowers's application of the presumption of death as to Mr. Beeler, is not controlling upon this court.  Simply put, the state case and this federal case are two distinctly different cases.  The two cases not only took place in different fora, but the parties involved, the facts and evidence presented, the credibility determinations made, and the triers of fact, were all different.  The outcome of Mr. Martin's lawsuit in state court is not a competent basis for disturbing the jury verdict here.  The most reasonable interpretation of the evidence in this case is that Mr. Beeler consciously left his family, because there is only evidence of his intentional absence.

[52]In *Roberts,* Clarence Roberts was in trouble legally and financially, was dissatisfied with his family situation, and reported wanting to get out of the mess he was in and having a Swiss bank account

on appeal, the court held that the insurance companies introduced competent evidence to rebut the presumption of death and the plaintiff failed to prove the ultimate fact of the insured's death by a preponderance of the evidence. *Roberts*, 410 N.E.2d 1383-84.  In *Equitable Life*, the jury determined that the presumption of death arose and was not rebutted by alleged sightings,[53] and on appeal, the court refused to overturn the jury's verdict and noted that it was within the province of the jury to disregard the impeached and contradictory testimony of two witnesses claiming they saw the insured after his disappearance. *Equitable Life*, 127 N.E. at 12-13.

As in *Roberts* and *Equitable*, the applicability of the presumption of death in the instant case was subject to the fact-finder's determination, and here, the jury's finding that the presumption did not arise is supported by the facts and circumstances surrounding Mr. Beeler's disappearance.  In fact, the evidence created conflicting inferences regarding whether <u>any</u> of the three prongs of the presumption of death test was proven by the Beeler Trust, i.e. whether Mr. Beeler was inexplicably absent from home, whether Mr. Beeler failed to communicate with those persons who would be most likely to hear from him, and whether a diligent inquiry and search was conducted.

Mr. Beeler, after promising never to cheat on his wife again, had an affair with his daughter's Catholic grade school coach, a married woman more than a decade younger than him.  Mr. Beeler notably tried to look more youthful, and he started to act strangely– exercising obsessively, losing weight, dressing differently, and styling his hair differently.  He started drinking heavily and

---

with more than $100,000.  *Roberts*, 410 NE.2d at 1383.

[53]In *Equitable*, there was no direct evidence of the insured's death, but at the time of the insured's disappearance, more than 7 years before the commencement of the action, the insured was happily married with children, but was suffering from poor heath, alcohol and morphine addiction, had previously attempted suicide, and committed forgery.  *Equitable Life*, 127 N.E. at 12.

distancing himself from the family.  The rumors of his affair became public, greatly embarrassing the Beeler's.  Mrs. Beeler soon discovered that the rumor was no rumor, but the truth.  The Beeler marriage crumbled and the children refused to accept their father's apologies– Mr. Beeler was kicked out of house on numerous occasions, did not spend holidays with the family but instead rented his own house and threw a party at the Granger home with his friends.  His belongings were destroyed by his children and his wife sought formal separation and a restraining order.  Before his disappearance, Mr. Beeler meticulously lined up his family's financial affairs, refused to spend money out of the bank accounts for several weeks, diverted financial statements to the home address, rented a storage locker in an assumed name, and wrote Mrs. Beeler a cold, calculating, and remorseless farewell letter stating that he'd cleaned up the condo so there would be "no trace" of him.

AXA and Reliastar insured Mr. Beeler's life, with the contingency that benefits would be paid only upon his death.  It was within the province of the jury to determine the credibility of the witnesses, and to ultimately find that Mr. Beeler's disappearance was explainable by a reasonable hypothesis other than his death.  In fact, the jury could have reasonably found that Mr. Beeler was not absent for seven years, where the testimony of numerous unimpeached witnesses reported seeing Mr. Beeler after January 31, 1998, including Lisa Liegl who was "100% certain" that she saw Mr. Beeler in the Indianapolis airport in May 2004.  This fact alone sustains the jury's verdict.

It cannot be said that this was the only element not proven.  Although an independent investigative firm was hired and Mrs. Beeler contacted many personal friends with political connections to help locate Mr. Beeler, the jury heard more.  The family did not pursue the leads in Key West immediately after Mr. Beeler's disappearance, and only the self-interested (and invested)

Mr. Martin throughly investigated the Beeler's finances– without bothering to draft a written report of his findings.  Mr. Beeler sent his wife thousands of dollars in "extra" cash.  The origin of this money, and quite possibly other money, remained unknown.  Further, investigations were limited by the required confidentiality and other limitations imposed by Mrs. Beeler and Mr. Martin, including the explicit refusal to provide financial records to the private investigators and law enforcement agencies.  Thus, special interests may have gotten in the way of completing a timely and diligent search and investigation.

Likewise, Mr. Beeler's mother and father, residing in southern Illinois, and Mr. Beeler's three siblings, Judy, Rich, and John, living in the United States, were never called as witnesses and no evidence was introduced to confirm their lack of communication with Mr. Beeler.[54]   The jury certainly could reasonably conclude that Mr. Beeler's own parents and siblings, absent evidence of some breach in the family, would be most likely to hear from him.  After all, Mr. Beeler disappeared when he was rejected by his wife and children, not after a fallout with his parents and siblings.

Viewing the evidence in the light most favorable to the defendants, it is possible and reasonable to conclude that the plaintiff failed on each prong of the presumption of death test.  Thus, the extensive evidence supports the jury's verdict in finding that the presumption of death did not arise in the first instance.

(2)     Jury Instruction Number 22 - "Inexplicably absent"

The Beeler Trust argues that jury instruction number 22[55] erroneously raised the standard for

---

[54]Trans. at Vol. II, 74 - 78.

[55]The relevant portion of jury instruction number 22 read as follows:
    As used in these instructions, the phrase "inexplicably absent" means that his absence is unexplained by circumstances other than those suggesting death.  The plaintiff

invoking the presumption of death by requiring that Mr. Beeler be 'inexplicably absent,' or by requiring that his absence be "unexplained by circumstances other than those suggesting death." The Beeler Trust argues that this language required the Beeler Trust to negate every possible explanation for Mr. Beeler's continuing absence other than death.

Nearly 130 years ago, the United States Supreme Court articulated its understanding of the presumption of death in *Davie v. Briggs*, 97 U.S. 628, 633-34 (1878): "A person shown not to have been heard of for seven years by those (if any) who, if he had been alive, would naturally have heard from him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death." Indiana courts have recognized that proof of absence alone will not give rise to the presumption, *Metro. Life Ins. Co. v. Lyons*, 98 N.E. 824, 825-26 (Ind.Ct.App. 1912), and have required that the insured be "inexplicably absent." *Roberts v. Wabash Life Ins. Co.,* 410 N.E.2d 1377, 1382 (Ind.Ct.App. 1980); *Equitable Life Assur. Soc. v. James*, 127 N.E. 11 (Ind.Ct.App. 1920)*; Lyons,* 98 N.E. at 825. The Beeler Trust's proposed verdict form (Doc. No. 87) even suggested that Mr. Beeler needed to be "inexplicably absent" to raise the presumption. *See infra*.

The jury was properly instructed on the law, as the court's instruction is a quote from *Roberts*, in all material respects. Instructing the jury that Mr. Beeler's absence must, by a preponderance of the evidence, be unexplained by circumstances other than those suggesting death, did not raise the Beeler Trust's burden of proof. The Beeler Trust was not required to negate every

---

must show more than the mere absence of Gordon Beeler.
    If you find from your consideration of all the evidence that any one of these elements has not been proved by a preponderance of the evidence, then you may not presume that Gordon Beeler is deceased . . .

possible explanation for Mr. Beeler's absence, but it was required so show that it was more likely than not that Mr. Beeler's absence was not explained by something other than death.  *See*, 9A *Couch on Insurance* § 138:11 (2006).  As previously explained, AXA and Reliastar were only required to pay the insurance proceeds upon Mr. Beeler's death– not solely upon his absence.  If Mr. Beeler's disappearance was explicable by circumstances indicating that Mr. Beeler was not dead, then the defendants were not obligated to pay.

The Beeler Trust was unable to meet its burden.  The evidence presented shows that the Beeler Trust was only able to prove that Mr. Beeler was absent, and the law is clear that absence alone is not enough.  Furthermore, Mr. Beeler's absence was explained by the fact that for several months tension mounted within the Beeler family, several times Mr. Beeler was kicked out of his home, and eventually Mr. Beeler was completely rejected by his family.  Mr. Beeler meticulously organized his family's affairs before he pursued a separate life on his own, and kept his promise that he would never bother the family again.

Along with all the evidence and arguments, the jury was not misinformed about the applicable law, nor was the instruction prejudicial to the Beeler Trust because the jury was not likely confused or misled.  *See, Susan Wakeen Doll Co., Inc., v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001); *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000). The evidence introduced at trial indicated that Mr. Beeler's disappearance was explainable by a reasonable hypothesis other than his death– his wife and children would not give him another chance and thus he purposely prepared to leave them for another life.  The defense only offered this one explanation for Mr. Beeler's absence, and the jury was entitled to believe that Mr. Beeler's absence was not "inexplicable" – or was explained by something other than death.

(3)    Failure to Rebut the Presumption of Death as a Matter of Law

The Beeler Trust argues that the defendants offered nothing to rebut the presumption of death as a matter of law because the defendants failed to provide sufficient evidence that, 'while it is possible that the insured could be dead, it is at least equally probable that he is still among the living.' *See* Jury Instruction Number 22.[56]  According to the Beeler Trust, defendants only offered the alleged untenable and discredited testimony of Lisa Liegl, and nearly all the other evidence addressed the circumstances leading up to Mr. Beeler's disappearance, and not to whether Mr. Beeler is still alive.

First, in order to reach this issue, the court would have to find that the presumption of death arose as a matter of law, contrary to the jury's finding.  For the reasons previously stated, whether the presumption arose was properly put before the jury, and the jury's verdict was supported by the evidence.  In terms of rebutting the presumption, the court cannot make credibility determinations or reweigh the evidence to disturb the jury's verdict.  *See, Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *Davis v. Wisconsin Dept. of Corrections*, 445 F.3d 971, 975 (7th

---

[56]The relevant portion of jury instruction number 22 read as follows:

If, on the other hand, you find from your consideration of all the evidence that each of these elements has been proved by a preponderance of the evidence, then you may presume that Gordon Beeler is deceased.  However, if you find that the presumption of death applies as to Gordon Beeler (or you presume that Gordon Beeler is deceased), then you must determine whether or not the Defendants have introduced evidence tending to rebut the presumption of his death.  When there is any evidence tending to rebut the presumption of death, arising from such absence, it is for you, the jury, to say whether such evidence is sufficient to rebut the presumption of death.  In other words, the presumption of death is not a conclusive presumption, but may be rebutted by proof of facts and circumstances inconsistent with, and sufficient to overcome, the presumption. Defendants may rebut the presumption of death by introducing evidence that shows that, while it is possible that Gordon Beeler is dead, it is at least equally probable that Gordon Beeler is still among the living.

27

Cir. 2006).  Lisa Liegl's emphatic testimony that she was 100% certain that she saw Mr. Beeler in 2004, alone precludes the Beeler Trust's request for judgment as a matter of law.

Even if the presumption of death arose, there is an overwhelming amount of evidence, recited above in relation to the first issue, which shows that it is at least equally probable that Mr. Beeler is still among the living.  The issue of whether the presumption was rebutted would have been a jury determination– but since the presumption never applied, it certainly need not be rebutted.

(4)      Not Allowing the Jury to Consider Question 3 of the Verdict Form

The Beeler Trust argues that although a presumption of death may arise under certain circumstances, it is universally recognized that death may be proved by circumstantial evidence before the maturation of any presumptive period (and the existence of a presumption does not preclude proof of death before the presumption applies).  *See* 45 Am. Jur. Proof of Facts 307 *Presumption or Inference of Death from Unexplained Disappearance* § 2 (3d ed. 2007); *In re Starr*, 128 Cal.Rptr.2d 282 (Cal.App. 2002).  Plaintiff argues that the court submitted an improper special verdict form because it did not allow the jury to consider whether the Beeler Trust proved the ultimate fact of Mr. Beeler's death, without applying the presumption.  The court disagrees.

First, the Beeler Trust projected to win the case only by proving that Mr. Beeler should be presumed dead.  The Beeler Trust's proposed verdict form evidences its intent:

> **Ladies and Gentlemen of the Jury:**
> 1.      Do you find from a preponderance of the evidence that Gordon L. Beeler has been inexplicably absent from home for a continuous period of seven years, has failed to communicate with those persons who would be most likely to hear from him, and cannot be found despite diligent inquiry and search?
>      [Check] _____ Yes [or] _____ No
> **If you answered "no," you have found for the Defendants.  Stop here and sign the form below.  If you answered "yes," please**

28

proceed to Question No. 2.

(Doc. No. 87) (emphasis in original).  This portion of the Beeler Trust's proposed verdict form is no different than the special verdict form provided to the jury.  The trial was long ago narrowed to the sole issue regarding whether the presumption of death arose and whether it was rebutted.  There was no other way for the Beeler Trust to win.  The Beeler Trust's claim for the insurance proceeds was based *exclusively* on the applicability of the presumption of death – as precisely stated in the Amended Complaint (paragraphs 12 and 14), pretrial pleadings, and as determined by this court in ruling on the summary judgment motions.  The Beeler Trust never objected to the court's order, never asked to amend the complaint, never asked for clarification, and never indicated at the outset of trial that a purported second alternative basis for recovery existed.  The plaintiff accepted the verdict form without objection, until just prior to closing arguments.

A district court is not required to formulate a special verdict form in a manner that has no legal basis from the pleadings or no factual basis in the evidence admitted at trial.  *Bularz v. Prudential Ins. Co. of America*, 93 F.3d 372, 377 (7th Cir. 1996); *U.S. Fire Ins. Co. v. Pressed Steel Tank, Co., Inc.*, 852 F.2d 313, 318 (7th Cir. 1988).  The court properly constructed a special verdict form to allow the jury to consider the only issue tried, whether the presumption of death applied.  *See* Fed. R. Civ. P. 49; *Hibma v. Odegaard*, 769 F.2d 1147, 1157 (7th Cir. 1985).

Second, since the jury reasonably found that the Beeler Trust failed to prove that the presumption of death arose, then it would be illogical to have the jury consider whether the ultimate fact of Mr. Beeler's death was proven.  *Roberts* supports this conclusion:

> In the case at bar, the [insureds] had the burden of proof throughout the trial.  Once [the insureds] introduced evidence of the basic facts which gave rise to the presumption of death, the insurance companies

29

> had the burden of going forward with evidence rebutting the presumption of death. If the insurance companies had not done so, the [insureds] would have prevailed. The insurance companies did introduce competent evidence to rebut the presumption of death. The [insureds] *were then obligated to prove*, by direct and circumstantial evidence and the reasonable inferences to be drawn therefrom, the ultimate fact of [his] death."

*Roberts*, 410 N.E.2d at 1383-84 (emphasis added).   Thus, the ultimate question of death is not reached, unless the presumption arises and is rebutted.

Third, there was no error in not allowing the jury to reach the ultimate question of death.  No evidence of actual death exists, and the Beeler Trust offers no support and states no facts which would indicate its ability to prove Mr. Beeler's death, irrespective of the presumption.  The Beeler Trust offers that the jury should have considered whether "after nine years and no word or credible sighting, Gordon Beeler is likely to be dead."  Neither the Beeler Trust nor this court can substitute its credibility determinations for the jury's.  And, as admitted by plaintiff, the evidence addressed the circumstances leading up to Mr. Beeler's disappearance, and not to whether Mr. Beeler is still alive– thus, proof of Mr. Beeler's death is lacking.  The Beeler Trust even told the jury "If you all believe that Lisa Liegl actually saw Gordon Beeler in the flesh in May 2004, we lose.  That's the elephant in the room. . .[w]e lose . . ."[57]  This case was never about proving Mr. Beeler's death without reliance on the presumption, because the Beeler Trust could not do so.  Thus, the special verdict form imposed no prejudice on the plaintiff.

## B.  *Motion for New Trial*

As an alternative to its request for judgment notwithstanding the verdict, the Beeler Trust asserts that it should be granted a new trial.  The Beeler Trust's reasoning behind requesting a new

---

[57]Trans. at Vol. VI, 40.

trial overlaps the issues addressed.

"A motion for a new trial should succeed '[o]nly when the verdict is contrary to the manifest weight of the evidence . . .'". *Research Systems Corp. v. IPSOS Publicite,* 276 F.3d 914, 921 (7th Cir. 2002) (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000)). The denial of a motion for a new trial will not be overturned unless there is no reasonable basis in the record to support the jury verdict. *Research Systems Corp.*, 276 F.3d at 921 (citations omitted).

The undersigned, having not been the trial judge is at some disadvantage; however, the transcript of the trial has been throughly reviewed and the parties have extensively briefed their positions. The facts are largely undisputed, and the question is whether the law was properly applied to those facts.

The jury's finding that the presumption of death did not arise is amply supported by the facts and circumstances surrounding Mr. Beeler's intentional disappearance. Once again, Lisa Liegl's eye-witness account of seeing Mr. Beeler in 2004 is enough to deny the motion. In addition, the record reflects that for eight months the Beeler family experienced their father becoming increasingly estranged from the family and attracted to those things that fueled the tension. Having endured enough embarrassment and hurt, the family refused to forgive their father. Thus, Mr. Beeler artfully and thoughtfully arranged the family's financial affairs, and left Mrs. Beeler equipped to continue on in his absence. Mr. Beeler forewarned that he would never wake the kids again and that there would be no trace of him left behind. The law is clear that proof of Mr. Beeler's absence alone is not enough. *See Metro. Life Ins. Co. v. Lyons*, 98 N.E. 824, 825-26 (Ind.Ct.App. 1912). The most reasonable interpretation of the evidence is that Mr. Beeler consciously left his family and this life to live another. The jury reasonably concluded that Mr. Beeler was not presumptively dead. Lastly,

proving death in fact was not possible for the Beeler Trust because there simply is no proof of Mr. Beeler's death.  The only thing that the Beeler Trust could prove, and did prove, was Mr. Beeler's absence, an absence that was intentional, planned, explained, and not enough to meet the Beeler Trust's burden.  The jury trial in the cause was fair, the jury verdict reasonable, and the law was properly applied without prejudice.  Thus, a new trial is not appropriate in light of the overwhelming evidence sustaining the verdict.

## CONCLUSION

On the basis of the foregoing, the Beeler Trust's "Renewed Motion for Judgment as a Matter of Law, or in the Alternative, For New Trial" is **DENIED** (Doc. No. 102).

SO ORDERED.

DATED: February 26th , 2008

      s/ William C. Lee
_____
WILLIAM C. LEE, JUDGE
UNITED STATES DISTRICT COURT
